## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-80820-CIV-HURLEY (Lead Case)
### (Consolidated with Case No. 08-81185)

**ARTHUR SMITH and SUE SMITH,**
        **plaintiffs,**
**vs.**
**POWDER MOUNTAIN, LLC, et al.,**
        **defendants.**

_____/                    **Case No. 08-80820**

**FDB II ASSOCIATES, LP,**
        **plaintiff,**
**vs.**
**STONE CREEK INVESTMENT CO., LLC, et al.,**
        **defendants,**
**vs.**
**FIDELITY INVESTMENTS,**
        **garnishee.**

_____/                    **Case No. 08-81185**


### ORDER ON POSTJUDGMENT CROSS MOTIONS FOR SUMMARY JUDGMENT

This cause is before the court on postjudgment proceedings in aid of execution presenting

a priority dispute between two creditors: FDB II ASSOCIATES, LP ("FDB") and PFP Asset

Recovery LLC ("PFP").  FDB, the plaintiff/judgment creditor in the above-styled federal action

(Case No. 08-81185), asserts a superior interest in securities accounts held by Fidelity Investments

in Boston, Massachusetts and owned by defendant/judgment debtor Arnold Mullen, under lien

perfected through writs of garnishment served on Fidelity on July 1, 2010 pursuant to §§ 678.1121

and 77.06, Florida Statutes.[1]  PFP is a third-party creditor which claims a superior interest in the

---

[1] FDB's suit against Arnold Mullen resulted in entry of a consent final judgment for damages in the amount of $1,000,000.00 on March 5, 2010 [DE 80].  On June 24, 2010, FDB applied for issuance of a writ of garnishment against Fidelity Investments, a brokerage house located in Boston, Massachusetts where Mullen maintained numerous accounts titled in his name and other family members.

same Fidelity accounts under §678.5101(1), Florida Statutes.  PFP contends it is a protected purchaser who allegedly gave value for the accounts, did not have notice of the FDB claim, and obtained control of the accounts before the FDB writs were served.

PFP moves to dissolve FDB's writs of garnishment [DE 274, 296] and FDB moves for entry of final judgment of garnishment against the garnishee, Fidelity Investments ("Fidelity") [DE 272]. Both sides have filed corresponding motions for summary judgment in support of their competing ownership claims [DE 307, 310].

**Background**

The undisputed material facts are set out in chronological order:

On October 15, 2008,  FDB filed fraud, breach of contract and breach of fiduciary duty claims against  Arnold Mullen in the above styled action ("the federal action")(Case No. 08-81185). On March 5, 2010, this court entered a final consent judgment against Mullen in the principal amount of $1,000,000.00 upon those claims.

On January 23, 2009, the Paul & Phyllis Fireman Charitable Foundation ("Charitable Foundation) and Paul Fireman, individually d/b/a PFP Associates ("Fireman") filed fraud, conversion and breach of fiduciary duty claims against Arnold Mullen in the Circuit Court for the Fifteenth Judicial Circuit of Florida, Case No. 2009CA002404 ("the state court action"),  contending that Mullen stole over $100 million dollars from Fireman and the Fireman Charitable Foundation. On January 26, 2009, the state court issued a temporary injunction prohibiting Mullen from accessing his assets, including the two Fidelity accounts at issue in these  garnishment proceedings (the "Restricted Accounts").  On February 3, 2009, the state court denied Mullen's motion to dissolve the injunction, while allowing  him a fixed distribution for living expenses.

On June 11, 2010, Fireman and Mullen entered into a Restitution and Property Transfer Agreement ("Restitution Agreement"), under which Mullen agreed to transfer all of his rights, title and interest in certain assets, including the Fidelity Restricted Accounts, to Fireman or Fireman's assignee, in settlement of the state court claims. Ultimately, Fireman designated "PFP Asset Recovery LLC" ("PFP") as the entity authorized to receive all assets transferred in settlement of the state court action.

On June 30, 2010, the state court approved the Restitution Agreement and entered a corresponding agreed order dissolving the asset freeze and ordering Mullen to transfer various assets, including the Fidelity Restricted Accounts, to an account of the state court plaintiffs (Paul & Phyllis Fireman Charitable Foundation and Paul Fireman, individually and d/b/a PFP Associates) or the plaintiffs' designee, or to any other account to be designated by the state court plaintiffs.

Initially, on June 30, 2010, Paul Fireman emailed directions to Fidelity on "PFP Associates" letterhead attaching a copy of the state court's transfer order and instructing Fidelity to "immediately transfer the accounts held by Fidelity" to designated accounts held in the name of "PFP Asset Recovery LLC" at the Bank of America [DE 280-1]. A series of emails addressing the mechanics of the transfer ensued between PFP's counsel in Florida (Gunster Yoakley) and Fidelity's Associate General Counsel in Boston (Richelle Kennedy) [DE 310-1]:

**1. June 30, 2010**:

At 9:38 a.m., Helen Seligman, paralegal (Gunster Yoakley), writes to Richelle Kennedy:

Richelle, Thanks for speaking with me this morning. I am attaching the Order that dissolves the Injunction and authorizes release of funds to Mr. Fireman. I'm also attaching the Injunction for your reference. I will send a certified copy of the Order to you via FedEx. Please confirm via reply email that you received the Order, and

that the monthly transfer of $36,500 will cease effective immediately.  Letters of instruction regarding the transfer of funds will follow.  Thanks again.

**2.  June 30, 2010**:

At 9:55 a.m.,  Kennedy replies:

Helen: I can confirm that we have received the court order and are placing a stop of the monthly transfer of $36,500 into Mr. Mullen's unrestricted account.

**3.  June 30, 2010**:

At 3:26 p.m., Ms. Seligman inquires:

Richelle, Attached please find a Letter of Instruction regarding the transfer of funds in the accounts affected by the Injunction.  Also attached for your reference is the Order that was entered today.  Please reply to confirm receipt.  Let us know immediately if you require anything else.

**4.  June 30, 2010**:

At 3:34 p.m., Kennedy replies:

Thanks Helen.  I can confirm receipt.  Can you get Mrs. Fireman's signature as trustee of the Foundation?  I know we discussed that issue this morning and my impression was that it would not be a problem to get her signature on the instructions.  Please let me know.  Thank you.

**5.  July 1, 2010**:

At 11:34 a.m,. Seligman inquires:

Richelle, I'm following up on a voice mail I just left for you.  Can you give me the status of the release and transfer of assets from the accounts?  Thanks.  Regards.

**6. July 1, 2010**:

At 11:45 a.m., Kennedy responds:

We are working on a list of issues to talk about. I am still waiting for some additional information on the securities held in the various accounts. The issues identified so far are: Mr. Fireman's authority to act on behalf of the Foundation, and the fact that certain securities held in the accounts are not DTC eligible (i.e. mutual funds). I am hoping to get back to you this afternoon with suggested courses of action on these issues, and a timetable.

**7. July 1, 2010**:

At 11:56 a.m., Attorney Joseph Santoro (Gunster Yoakley ) enters the dialogue:

Richelle, Mr. Fireman is a trustee of the Foundation and has full authority to act on its behalf. The failure to immediately transfer these accounts pursuant to the court's order and Mr. Fireman's instruction may cause serious harm to our client as the injunction has been released and we are very concerned about Mullen's other creditors coming after these assets. I appreciate your working with us, but this needs to get done and it needs to be immediately. Please do whatever is necessary to make this happen. Thanks.

**8. July 1, 2010**:

At 3:55 p m., Kennedy responds:

Here is a draft LOI. Please let me know what you think. Mr. Fireman would need to identify the Fidelity account into which he wanted the non-DTC eligible securities transferred.

Also, I have been advised that the "cash" in most of these accounts is actually invested in money market funds. So the "cash" is actually mutual fund holdings and would not be eligible for DTC transfer. Mr. Fireman could either direct the liquidation of all money market fund holdings, and then we could wire the cash to the Bank of America account. Or those positions could be journaled into another Fidelity account and liquidated after the transfer.

**9. July 1, 2010**:

Fidelity is served with two writs of garnishment issued by FDB in the above federal action.

5

**10. July 8, 2010**:

At 2:32 p.m., Kennedy writes to Santoro:

Joe - per my voice mail message, here is the draft LOI I sent last week.  It addresses the two issues we had - lack of Mrs. Fireman's signature (by including indemnification language) and instructions  to deliver the non -DTC eligible securities ( not addressed in original letter) to the newly set up PFP Asset Recovery Account.

As  you discussed with Brian, we have restricted the accounts subject to the garnishment, but stand ready to transfer the other accounts.  Please call me with any questions.  Thank you.

**11. July 8, 2010**:

At 2:37 p. m.,  Santoro replies:

Richelle, While I am not conceding that this letter is necessary,  we are working on getting it signed and will provide it to you as soon as we can. Thanks. Joe.

**12. July 8, 2010**:

At 3:16 pm., Santoro adds:

Richelle,
We now have access to Phyllis Fireman, so we are going to remove the last paragraph of the letter and add a signature block for Phyllis Fireman to sign as the other trustee of the Foundation.  Any problem with that?  Joe.

**13. July 8, 2010**:

At 3:17 p.m.,  Kennedy responds:

No problem - that's fine.  Please just indicate that she is signing in her capacity as trustee for the Foundation and that Paul is signing in his individual capacity  and as trustee.  Thank you.

**14. July 10, 2010**:

At 11:31 a.m., Attorney Brian Elias (Fowler White)(representing Fidelity), writes to Attorney Joe Santoro (Gunster Yoakley) (representing PFP):

Joe: I left you a voice mail at your office late last night as I did not hear your and your partner's message until then. I was surprised at the tone of your partner's message in light of the conversation that we had the previous day where I told you exactly what I was going to do and even added a paragraph in the answer that you requested I add. You said you understood the position Fidelity is in and were ok with what we were filing....

**15. July 12, 2010**:

At 9:03 a.m., Santoro replies:

Brian, I appreciate your email, but lets be very clear about our conversation. I in no way "okayed" what Fidelity has done. .....On what basis is your client holding the funds in excess of double the amount of the judgment from that account. Your client has a court order directing them to transfer these accounts that it is not complying with. In fact, your client had this order for three days prior to the writ being issued, yet ignored the court order and has created this problem. I know your client wants to simply hold everything and let us fight it out, and avoid responsibility for the problem it has caused. That is not going to be good enough. We need a real solution to this problem or things are going to escalate quickly. I will be in all day if you want to discuss.

**16. July 12, 2010:**

At 5:31 p.m., Santoro adds:

Attached is the Mullen Asset transfer agreement. As I mentioned, please keep this confidential and do not share it with anyone except your client. While I understand that plaintiff's counsel has been threatening to sue if you release our client's funds, you can clearly see from the Agreement that our clients own, not only the accounts, but also own the partnerships that hold the accounts. These documents were executed long before the writs were issued. Please give me a call after you have had a chance to review or if you have any questions.

**17. July 13, 2010**:

At 5:21 p.m. Elias responds:

Thanks for this Joe. It is helpful. I have discussed it with my client and they are now considering it internally. I have recommended that Fidelity transfer all of the partnership accounts per the court Order and just restrict the remaining accounts per the garnishment.

While I expect that they will go with my recommendation, they are understandably nervous in light of threats form the Smith attorneys and are aware that the safest course of action for Fidelity is to let the court decide what it should do.

In any event, I expect to hear shortly and I will let you know.

On July 14, 2010, Fidelity filed an Amended Answer to the writs of garnishment served in this federal action, stating that it held $3,459,960.13 and $234,290.66 in the two garnished securities accounts titled in Mullen's name.

On July 20, 2010, third-party PFP Asset Recovery LLC ("PFP"), as assignee of Paul Fireman, filed motion to dissolve the garnishment writs together with supporting affidavit of Paul Fireman claiming an ownership interest in the Restricted Accounts under the Restitution Agreement. PFP later supplemented this filing with an affidavit from Richelle Kennedy, identified as Vice President, Associate General Counsel, Fidelity Brokerage Services, LLC, dated December 9, 2010. In pertinent part, the Kennedy affidavit recites:

> On June 30, 2010, PFP Asset Recovery LLC ("PFP") .....sent Fidelity a trial court Order of the same date ...provid[ing] that certain assets held by Fidelity in the name of Arnold Mullen and Mullen family members were to be transferred to PFP.
>  .....
> On June 30, 2010, Fidelity agreed to follow PFP's instruction to place a stop of the monthly transfer of $36,500 from, in part, the subject accounts into Mr. Mullen's unrestricted account.
>                      ....
>
> On June 30, 2010, in light of the order furnished to Fidelity, Fidelity agreed to act according to PFP's entitlement orders regarding the subject accounts without Mullen's consent.
>
> On June 30, 2010, in light of the order furnished to Fidelity, Fidelity understood that PFP could direct a transfer of the contents of the subject accounts to itself without Mullen's consent.

8

At her deposition taken April 4, 2011, Ms. Kennedy elaborated that after she received a copy of the state court transfer order directed to Mullen (listing, among other accounts, twenty Fidelity accounts titled in Mullen's name), she continued to communicate with Mr. Fireman's Florida counsel "about additional information that needed to be included in the letter of instruction." [Kennedy Deposition, p. 16, lines 13-16][DE 310-2]. She explained that she asked Mr. Fireman's Florida attorneys to secure Mrs. Fireman's signature as Trustee of the Paul & Phyllis Charitable Foundation in order "to insure that the appropriate people who were authorized to act on behalf of the Foundation had signed the letter of instruction." [Kennedy Deposition, p. 18, lines 3-13].

Thus, according to Kennedy, as of June 30, 2010, Fidelity took the position that all plaintiffs in the underlying state court action or their authorized representatives needed to sign the letter of instruction before Fidelity could act on PFP's instructions. Because the Charitable Foundation was a named plaintiff in the underlying case, Kennedy believed that Mrs. Fireman's signature as Trustee of the Foundation was needed. [Kennedy Deposition, p.18, lines 14-22]. Short of a signature from Mrs. Fireman, Fidelity wanted an indemnity agreement from Mr. Fireman in exchange for Fidelity's compliance with his sole instructions on behalf of the Foundation. [Kennedy Deposition, p. 20, lines 10-14].

As indicated in the above email chronology, the required indemnification language (in lieu of Mrs. Fireman signature) was not settled until July 8, 2010, at which point the indemnity issue immediately became moot, as PFP's Florida counsel then represented that they had access to Mrs. Fireman and were in position to secure her signature on the letter of instruction.

Finally, Kennedy testified that she was unaware of any agreement negotiated between Fidelity and Mullen regarding Mullen's Fidelity accounts [Kennedy Deposition, p. 13, lines 19-22], and that

9

Fidelity agreed to follow the instructions of Fireman, a plaintiff in the state court action "because of the language contained in [the state court] order." [Kennedy Deposition, p.31, lines 4-10].

## II.  Summary of Competing Claims

PFP claims that the series of emails outlined above, in conjunction with the Kennedy affidavit, demonstrate that Fidelity "agreed" to act on PFP "entitlement orders" as of July 1, 2010, thus establishing PFP's "control" of the Restricted Accounts for purposes of Fla. Stat. §678.1061(4)(b), and its status as a protected purchaser under Fla. Stat. § 678.5101(1).  PFP advances the view that the "how what or why" Fidelity agreed to act on PFP's orders is irrelevant to the equation because a purchaser of a securities entitlement may effectively "obtain control" through simple gratuitous assent of the securities intermediary, without the necessity of a legally enforceable "control agreement."

In response, FDB urges that PFP cannot show a superior interest in the Restricted Accounts as a protected purchaser for value who "obtained control" within the meaning of §678.5101(1) for two reasons:  First, FDB contends that PFP has not proved the existence of a valid "control agreement" between PFP and Fidelity under the Uniform Commercial Code, as adopted by Florida, because it fails to show a clear, unambiguous offer and acceptance of terms governing PFP's right to direct the disposal of the Restricted Accounts as of July 1, 2010.  Second, it contends that there was no exchange of consideration between PFP and Fidelity, such that any gratuitous assent or promise to act in compliance with PFP's instructions on the part of Fidelity is effectively unenforceable, defeating PFP's claim of "control" within the meaning of § 678.1061(4)(b), Florida Statutes.

For reasons which follow, the court holds that PFP had not obtained "control" of the

Restricted Accounts as of July 1, 2010, and that PFP therefore can claim no superior rights to the Restricted Accounts as a protected purchaser under § 678.5101(1), Florida Statutes.

### III. Discussion

Section 678.5101(1), Florida Statutes, provides in pertinent part:

**678.5101  Rights of purchaser of security entitlement from entitlement holder.-**

(1) ..... [A]n action based on an adverse claim to a financial asset or security entitlement, whether framed in conversion, replevin, constructive trust, equitable lien or other theory, may not be asserted against a person who purchases a security entitlement, or an interest therein from an entitlement holder if the purchaser gives value, does not have notice of the adverse claim, and obtains control.

The parties agree that PFP is a "purchaser" of a "security entitlement" within the meaning of this statute; that Mullen is an "entitlement holder" and that PFP did not have notice of FDB's adverse claim at the time it gave value for its interest in Mullen's security entitlements. The sole contested issue – on which PFP's rights as a protected purchaser under §678.5101(1) hinge - is whether PFP had "control" over Mullen's security entitlements in the Restricted Accounts before July 1, 2010.

Under §678.1061(4), Fla. Stat., a purchaser has "control" of a security entitlement if:

(a)      The purchaser becomes the entitlement holder;

(b)      The securities intermediary has agreed that it will comply with entitlement orders originated by the purchaser without further consent by the entitlement holder;

(c)      Another person has control of the security entitlement on behalf of the purchaser or, having     previously acquired control of the security entitlement, acknowledges that the person has control on behalf of the purchaser.

PFP relies solely on subsection (4)(b) as premise for its purported "control" of the Fidelity Restricted Accounts at issue in this litigation. This subsection, derived from UCC Article 8-

11

106(d)(2), was designed to facilitate arrangements where a creditor/purchaser takes a security interest in an investment account while permitting the debtor/seller to maintain its status as entitlement holder, and to continue to trade and exercise other rights over the pledged securities account within prescribed limitations.  As one commentator notes:

> The alternative control mechanism established  by subsection 8-106(d)(2) enables the secured party to leave the collateral in the debtor's securities  account, but obtain an  agreement  from  the  intermediary  that  the  intermediary  will  comply  with entitlement  orders  originated  by  the  secured  party  without  further  consent  by  the entitlement holder. .... [This] can be accomplished by an agreement among Lender, Custodian  Bank  and  Debtor  of  the  sort  that  is  already  coming  to  be  known colloquially known as a  "control agreement " or "three party" agreement. [2]
>
> The only requirement that such an agreement must satisfy to confer control on the secured party is stated in subsection 8-106(d)(2) itself;  that is, the intermediary must have agreed "that it will comply with entitlement orders originated by the purchaser without  further  consent  by  the  entitlement  holder."   So long as the agreement provides that the intermediary will comply with the secured party's directions, it matters not whether the debtor is also permitted to continue to trade or exercise other rights over the account.  In this respect, the 1994 revision makes a sharp break with concepts derived from the common law of pledge, under which considerable doubt might be raised about the effectiveness of a purported pledge if the debtor retained some measure of dominion over the property.  Under the 1994 revision, the extent of the powers  retained by the debtor is irrelevant in determining whether the secured party has control.  **Rather, control turns solely on whether the secured party has the right to direct the intermediary to dispose of the collateral**.

7A Hawkland UCC Series §8-106:04 [Rev.](emphasis added).

The parties agree that a writing is not always required to show that a securities intermediary

---

[2]   Although commonly referred to as "three party agreements," "§ 8-102(d)(2) does not require that the debtor actually be a party to the agreement in which the intermediary agrees to act on directions from the secured party.  7A Hawkland UCC Series §8-106:04 [Rev.].  Instead, there may be separate agreements,  one between the intermediary and the secured party in which the requirement of  "control" under this section is satisfied,  and a separate agreement between the debtor and intermediary authorizing the intermediary to enter into the agreement between the intermediary and the secured party. *Id.*

has effectively "agreed" to honor an entitlement order of a purchaser,[3] but disagree as to whether the word "agreed" as used in this subsection means merely the expression of a willingness to comply with entitlement orders[4] from the purchaser – as PFP argues – or whether it connotes the expression of reciprocal assent or "meeting of the minds" giving rise to a legally enforceable "control agreement" – as FDB advances.

Following careful review of the parties' respective briefs, case authorities and commentary, the court agrees that to "agree" within the meaning of §678.1061(4)(b) necessarily implies a meeting of the minds resulting in a contractual undertaking between the securities intermediary and the creditor/purchaser of the securities entitlement. The contrary view advanced by PFP--calling for a broad interpretation of "agreed" under which any preliminary expression of assent qualifies to create "control" -- finds no support in the case law or commentary, and is contrary to the overarching goal of the Uniform Commercial Code of promoting clarity and predictability in commercial

---

[3]  Hawkland notes on this point:

> Although it will probably be the case that most such arrangements will be implemented by a written agreement to which the intermediary, secured party and customer are parties, note that subsection 8-106(d)(2) does not so require. Rather, subsection 8-106(d)(2) says only that the intermediary must have so "agreed." Given the broad definition of agreement in section 1-201(3), an arrangement sufficient to give the secured party control under subsection 8-102(d)(2) might be implemented even without any written agreement, though one suspects that one would be unlikely to encounter such a case except, perhaps, as a rescue effort in litigation for a transaction in which someone made some fairly obvious blunders in practical planning.

7A Hawkland UCC Series §8-106:04 [Rev].

[4]  § 678.1021(1)(h), Florida Statutes defines an "entitlement order" as "a notification communicated to a securities intermediary directing transfer or redemption of a financial asset to which the entitlement holder has a security entitlement."

relationships.[5]

Within the specific context of Article 8, "[a] principal purpose of the 'control' concept is to eliminate the uncertainty and confusion that results from attempting to apply common law possession concepts to modern securities holding practices." U. C. C. Text § 8-106 comment 7; Fla. Stat. §678.1061 comment 7. While historically, control of a certificated security was demonstrated by actual possession of the certificate, Article 8 of the UCC employed the "control" concept to create an effective substitute for possession for securities held indirectly through a securities intermediary – since such securities are not "possessed."

PFP's expansive reading of § 678.1061(4)(b) would add to "uncertainty and confusion" in securities holding practices. Under its view, PFP could have gained and lost control of Mullen's Fidelity accounts dozens of times a day depending on Fidelity's whim and arbitrary "agreeability" to its directions at any given moment in time. The drafters of the UCC and the Florida legislature that adopted it could not possibly have intended that the legal status of publicly traded securities would hinge on such a fluid and subjective concept of "agreeability." The court thus rejects this

---

[5] Article 1-102(1) of the Uniform Commercial Code states "this code shall be liberally construed and applied to promote its underlying purposes and policies."

The three primary purposes and policies of the Florida UCC are: "(a) to simplify, clarify and modernize the law governing commercial transactions; (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties and (c) to make uniform the law among the various jurisdictions. Fla. Stat. § 671.102(2).

The official comment accompanying Section 1-102 further explains:

The Act is drawn to provide flexibility so that, since it is intended to be a semi-permanent piece of legislation, it will provide its own machinery for expansion of commercial practices. It is intended to make it possible for the law embodied in this Act to be developed by the courts in the light of unforeseen and new circumstances and practices. However, the proper construction of the Act requires that its interpretation and application be limited to its reason..

view and holds that a contractual obligation is required, as opposed to a mere expression of preliminary intent to acquiesce, to show that a securities intermediary has "agreed" to follow the directions of a security entitlement purchaser under §678.1061(4)(b).[6]

This conclusion finds support in the UCC definition of "agreement,"[7] incorporated into Article 1-203(3), adopted at §671.201(3), Florida Statutes:

> "Agreement" as distinguished from "contract," means the bargain of the parties in fact as found in their language or inferred from other circumstances, including course of dealing, usage of trade or course of performance as provided in ss. 671.205 and 672.208.

Under the UCC, an "agreement" is not recognized simply because a party gratuitously "agrees" or promises to do an act. Rather, as in the case of any other contract, there must be the essential elements of offer, acceptance and consideration. *Leesburg Community Cancer Center v. Leesburg Regional Medical Center, Inc.,* 972 So.2d 203 (Fla. 5th DCA 2007); *Acosta v. District Board of Trustees of Miami-Dade Community College*, 905 So.2d 226 (Fla. 3d DCA 2005).

The inquiry accordingly turns to whether the record reveals any genuine issue of material fact on the question of whether Fidelity and PFP ever came to a "meeting of the minds," resulting in a binding control agreement over the Restricted Accounts, before the FDB writs of garnishment were served on July 1, 2010. Because the record, interpreted in light most favorable to PFP, reflects at best that Fidelity simply gave a preliminary indication of its willingness to acquiesce with PFP

_____

[6] See also Fla. Stat. §678.1071 ("Whether indorsement, instruction or entitlement order is effective"), comment 3 ("The control rules in Section 8-106 provide for arrangements where a person who holds securities through a securities intermediary ... . enters into a control agreement giving the secured party the right to initiate entitlement orders of instructions.")

[7] In turn, Florida's adaptation of the UCC defines a "contract," as distinguished from an "agreement," as "the total legal obligation that results from the parties' agreement as determined by this code and as supplemented by any other applicable laws." §671.201(12), Florida Statutes.

entitlement orders once certain essential terms and conditions were met, and unequivocally demonstrates that there was *no* agreement on at least one of those essential terms as of July 1, 2010 (the participation of Mrs. Fireman as a necessary party to validate the authority of PFP), the court concludes, as a matter of law, that there was no express or implied control agreement between PFP and Fidelity as of July 1, 2010.

As more particularly discussed below, PFP accordingly can claim no superior interest in the Restricted Accounts as a "protected purchaser" within the meaning of §678.5101(1), Florida Statutes, and FDB is entitled to entry of final summary judgment of garnishment in its favor against Fidelity, as garnishee.

## 1. Reciprocal Assent

There is evidence that Fidelity promised to restrict Mullen's right to alienate his Fidelity accounts immediately after it received a copy of the state court injunction against Mullen and corresponding transfer order on June 30, 210. However, there is no evidence that PFP requested and that Fidelity agreed to acknowledge and comply with "entitlement orders" issued by PFP (acting solely through Paul Fireman) as of July 1, 2010.

To the contrary, the email chain between the PFP and Fidelity attorneys reveals a continuing debate over the necessity of Mrs. Fireman's signature on PFP's "draft" or proposed letter of instruction to Fidelity (directing a liquidation and transfer of the account assets to an account titled in the name of PFP at another financial institution). This contest was not resolved until at least July 8, 2010, when PFP confirmed that it had obtained Mrs. Fireman's consent, and Fidelity represented it was then prepared to transfer assets from all Fidelity accounts titled in Mullen's name, *except for* the Restricted Accounts.

16

Thus, as of July 1, 2010, the parties plainly had not agreed upon the essential terms under which Fidelity would recognize PFP's authority to issue *any* entitlement orders over Mullen's Fidelity accounts, including the Restricted Accounts. Instead, the undisputed evidence shows that Fidelity was willing to comply with PFP's directions regarding securities entitlements titled in Mullen's name *only* upon execution of documentation acceptable to Fidelity (a letter of instruction signed by *both* Mr. and Mrs. Fireman). The evidence is also undisputed that this did not occur by July 1, 2010.

Contrary to PFP's suggestion, the chain of email communications between PFP's Florida attorneys and Fidelity's Boston counsel is not susceptible of reasonable inference that the parties had entered an implied, oral control agreement before July 1, 2010; rather, at best this evidence suggests that Fidelity believed that the named plaintiffs in the state court action (the Charitable Foundation and Paul Fireman, individually and d/b/a PFP Associates) had authority to designate a transferee for the Fidelity accounts enumerated in the state court transfer order, but did not believe that PFP Asset Recovery, LLC had been designated as such an authorized transferee by all plaintiffs in that action.

The deposition testimony of PFP corporate representative Jack McElhinney reinforces the conclusion that Fidelity and PFP remained at odds over PFP's power to direct a transfer of property from the Restricted Accounts as of July 1, 2010. Commenting on the controversy over Mrs. Fireman's participation in the transfer arrangements, McElhinney testified:

Q. And here, what was the issue with Mrs. Fireman's signature, if you know?

A. That issue was totally on Fidelity's side. We were, you know, frankly, a little upset that they were in –in– insisting on that.
....

Q. What was the position Fidelity was taking regardless of whether you agree with

17

it or not?

A.  I'm not sure what Fidelity was – was thinking at the time. .... They said they wanted Mrs. Fireman's signature.  We told them it wasn't required.  But frankly, as a matter of expediency, we could get it.  So, we did do that....

[McElhinney Deposition, pp. 48-49][DE 308-1].

With regard to Ms. Kennedy's June 30, 2010 email reference to "a list of issues to talk about," McElhinney further commented:

Q.  ...[I]t seems like Fidelity's in a very different place than PFP as far as their expectation of the mechanics of the transfer and the status. Do you know what issues she's talking about?

A.  I wouldn't say they were in a different place.  I would – I think she's referring to the fact that some of these are DTC or Non-DTC securities and can't be moved directly to Bank of America.  **And then she continues to raise, to Joe Santoro's chagrin, what we felt was this irrelevant issue with the Foundation and the Authority**.... And so, he was getting – obviously,  as you could see from the tone, very frustrated.

[McElhinney Deposition, p. 58, lines 1 through 15][DE 308-1][emphasis added].

McElhinney acknowledged that this debate continued at least up through July 8, 2010:

Q.  So, as of July 8, 2010,  there was still some outstanding issues with respect to the -- at least, the form of the letter of intent [sic]  that Fidelity  was going to require?

A.  I think there were outstanding issues in Fidelity's  mind, you know.

Q.  Well, they were taking a position and PFP was taking a position, correct?

A.  Yes. Yeah.... We felt they should have been transferred long before that.

[McElhinney Deposition, p. 62, lines 7 through 18][DE 308-1].

On this evidentiary backdrop, there is no genuine issue of material fact on the question of whether  Fidelity and PFP came to a meeting of the minds, resulting in a  binding control agreement, before the  FDB  writs  of garnishment  were  served on July 1, 2010.  While Fidelity did give

18

preliminary signs of a willingness to take directions from PFP, its compliance was always made expressly conditional upon Mrs. Fireman's participation and approval of PFP Asset Recovery LLC as an authorized transferee of the assets from Mullen's Fidelity accounts.  The record reveals that PFP adamantly disagreed on the necessity of Mrs. Fireman's participation and authorization of the proposed transfer up through July 1, 2010, although it ultimately did, as a matter of expediency, come forward with assurances of her participation seven days later.

Because the undisputed evidence shows this essential term and condition of PFP's proposed liquidation and transfer was not met by July 1, 2010, the court concludes, as a matter of law, that there was no "control agreement" in place between PFP and Fidelity as of that date.  *See e.g. First National Bank of Palmerton v. Donaldson, Lufkin & Jenrette Securities Corp.*, 1999 WL 163606 (E.D. Pa. 1999)(rejecting implied control agreement theory where securities intermediary acceded to some directions of lender, but no "clear offer" of contract terms or proof of securities intermediary's "unconditional and absolute" acceptance of proposed security arrangement); *United Hudson Bank v. PNC Bank New England ,* 2006 WL 337061, 58 UCC Rep. Serv. 2d 984 (Conn. Super. 2006)(no written or verbal control agreement absent evidence that securities intermediary "agreed to be bound').

The December 2010 affidavit of Ms. Kennedy does not alter the analysis.  The legal conclusions and opinions of Ms. Kennedy are not binding on this court, and Ms. Kennedy's after-the-fact analysis of what transpired between PFP and Fidelity in June and July of 2010 does not give rise to a contractual obligation or control agreement between PFP and Fidelity.  Despite what Fidelity or its attorney says it thought or believed regarding PFP's authority to control the accounts at that critical point in time, the record contains no evidence of an actual control agreement in place

19

between PFP and Fidelity as of  July 1, 2010. *See e.g. First National Bank of Palmerton v. Donaldson, Lufkin & Jenrette Securities Corp.*, 1999 WL 163606 * 4 (E.D. Pa. 1999)("despite what bank says it "thought," the complaint contains no evidence of a control agreement having been entered into at this point").

Nor does record alternatively support a finding that PFP obtained "control" over the Restricted Accounts before July 1, 2010 pursuant to the state court injunction or transfer order. Neither Fidelity nor FDB were parties to the state court action, and the state court orders in question was directed only to Mullen – not to Fidelity.   Accordingly, the orders created no obligation on the part of Fidelity to honor directions from Fireman or PFP Asset Recovery LLC, as Paul Fireman's designee, and therefore gave PFP no rights of  "control" over the Restricted Accounts  enforceable as against Fidelity.[8]

### 2.  Consideration

"Consideration" is a bargained-for exchange of promises. *Gulf Towing Co. v. Steam Tanker, Amoco, N.Y.*,  648  F.2d 242 (5th Cir. 1981)(Fla); *Jenkins v City Ice & Fuel Co.,* 118 Fla. 795, 160 So. 215 (Fla. 1935)*; Ballou v. Campbell*, 179 So.2d 228 (Fla. 2d DCA 1965).  A  gratuitous promise that is not made  pursuant to a bargained-for exchange of promises  between  parties is unenforceable and cannot sustain a contract.  *In re Fidelity Standard Mortgage Corp. v. Beck,* 36 B.R. 496 (S.D. Fla. 1983)(agreement to reassign mortgage was gratuitous and unenforceable against  Trustee), *aff'd*

---

[8]  A securities  intermediary assumes no legal obligation of any kind when presented with an injunction obtained against an account owner (as opposed to the intermediary itself). Hawkland, UCC Series Vol 7A, p. 341 (1996)(citing *Waffenschmidt v Mackay*, 763 F.2d 711 (5th Cir. 1985)(injunction prohibiting named person from disposing of securities  in which others asserted adverse claims binds actual confederates of person named in injunction,  but not bank which merely continued  normal commercial relations with the enjoined party despite awareness of injunction).

839 F.2d 1517 (11th Cir. 1988)(Fla.); *Bady v. Bady*, 455 So.2d 556 (Fla. 1st DCA 1984)(husband's stipulation to continue to pledge property for assurance of future appearance in court was gratuitous action on his part, not undertaken pursuant to agreement between parties or court order, and therefore unenforceable).  *See generally Mount Sinai Hospital of Greater Miami, Inc. v. Jordan,* 290 So.2d 484 (Fla. 1974)(mere gratuitous promise of future gift, lacking consideration, is unenforceable).

In this case, FDB alternatively urges that PFP can show no "agreement" within the meaning of §678.1061(4)(b), establishing PFP's right of "control" as "purchaser" of the Restricted Accounts, because there is no evidence of any "bargained-for" exchange between PFP and Fidelity needed to establish the existence of a  legally enforceable contractual undertaking between the parties. *Compare National Consumer Cooperative Bank  v  Morgan Stanley & Co.*, 2010 WL 3975847 (M.D. Pa. 2010)(control agreement between custodian brokerage house and bank lender supported by consideration where lender agreed to allow its  security  interest to remain in debtor's account with brokerage house in exchange for intermediary's promise to  monitor account and alert  lender if  debtor attempted to alienate any portion of its security interest).

The record is certainly susceptible of the inference that PFP was not bargaining for a control agreement with Fidelity.  Rather, at least initially, it appears that PFP sought to take possession of Mullen's securities entitlements via an outright transfer of title to the accounts pursuant to the Restitution Agreement.[9]  When that proved unfeasible, PFP attempted to  direct a  liquidation of the

---

[9]  An earlier exchange of emails between Fidelity and PFP's Florida counsel alludes to the parties' discussion and discard of a title transfer option:

On May 17, 2010, at 3:34 p.m., Richelle Kennedy at Fidelity  writes to Helen Seligman(Gunster Yoakley):

Helen - I am working on getting a letter of instruction form, and am hoping to get a dedicated person

contents of the accounts and transfer of the proceeds to its own banking account at the Bank of America.

PFP does not attempt to demonstrate that Fidelity benefitted from this arrangement or that its expressions of intent were supported by consideration or a bargained-for exchange between the parties, but rather takes the position that this discussion is entirely irrelevant because the word "agreed" as used in §678.1061(4)(b) does not necessarily require a contractual undertaking or enforceable "agreement."

It is ultimately unnecessary for the court to reach the issue of whether the record contains any evidence of consideration, or an exchange of "bargained-for" promises between PFP and Fidelity so as to support the existence of a "control agreement" in light of the court's threshold ruling on lack of evidence of reciprocal assent, i.e. the elemental "meeting of the minds" needed to support a legally binding contractual undertaking.

### III.  Decretal Provisions

Based on the foregoing analysis, the court concludes, as a matter of law, that PFP is not a "protected purchaser" who "obtained control" of the Restricted Accounts within the meaning of Fla. Stat. §678.5101(1).  Accordingly, FDB holds a superior interest in the accounts under lien

---

to assist you (and us) in this process.  I don't anticipate that it will be terribly complicated, but the owners of the accounts will need to instruct that the assets be transferred to an account held by the Firemans.  This could involve liquidating and wiring cash, or transferring assets in kind.  As we discussed, Fidelity cannot simply re-register the accounts to a new owner....

On May 17, 2010, at 4:03 p.m., Helen Seligman responds:

Richelle, Yes, we want to liquidate and transfer the funds, not transfer ownership of the accounts. We are working on our end to obtain consent.  Thank you for helping to expedite this matter.

perfected  through writs of garnishment served  July 1, 2010.

It is accordingly **ORDERED and ADJUDGED**:

1.  PFP's motion to dissolve writs of garnishment [DE 274] and renewed motion to dissolve the writs of garnishment [DE 296] are **DENIED**.

2.  FDB's motion for entry of final judgment on writ of garnishment against Fidelity Investments  [DE  272 ] is **GRANTED.**

3.  PFP's motion for summary judgment upon its claim as protected purchaser of the Restricted Accounts  under § 678.5101(1) [DE 307] is **DENIED.**

4.  FDB's motion for summary judgment upon its claim as superior  lien holder under writs of garnishment served July 1, 2010  [DE 310] is **GRANTED**.

5.  The Report and Recommendation of Magistrate James Hopkins on the motions to dissolve writs of garnishment and motion for entry of final judgment of garnishment [DE 303]  is terminated as **MOOT.**

6.  A final summary judgment of garnishment in favor of FDB and against Fidelity Investments shall enter by separate order of the court

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 16th day of  June, 2011.

Daniel T. K. Hurley
United States District Judge

cc. All counsel